### McPHERSON v. HAHL et al.

(Court of Civil Appeals of Texas. El Paso. March 8, 1913.)

Additional findings of fact.

For former opinion, see 151 S. W. 323.

HIGGINS, J. Supplementing the facts stated in the original opinion herein, we find additional facts as follows:

By deed dated December 20, 1905, R. E. Nutt and wife conveyed to C. W. Hahl and F. A. Connable, composing the firm of C. W. Hahl & Co., 10,997 acres of land in Bee county, Tex., and as a part of the consideration therefor the vendees executed notes aggregating $80,754.50, to secure the payment of which a vendor's lien was retained in the deed of conveyance.

On September 1, 1908, Hahl and Connable conveyed 10,900 acres of above-mentioned land to W. J. Candlish, Candlish assuming the payment of the balance due by Hahl and Connable upon their purchase money notes to Nutt, amounting to about $40,000, and in addition Candlish executed notes aggregating $50,924.65, payable to Hahl & Co. or order, and secured by a vendor's lien upon the land conveyed.

On September 1, 1908, after the delivery of the above-mentioned deed, Candlish entered into a written contract with C. W. Hahl & Co., appointing them his exclusive agents for the sale of said land, and authorizing them to sell same or any part thereof, or to contract for the sale thereof.

On September 10, 1908, Hahl & Co. entered into a contract with McPherson, who acted for himself and for L. V. Darrow and L. N. Paquin, which is as follows:

"State of Texas, Harris County. This contract this day made and entered into by and between C. W. Hahl & Company, a firm composed of C. W. Hahl and F. A. Connable, both of Harris county, Texas, as parties of the first part, and John J. McPherson, trustee, for himself, L. V. Darrow and L. N. Paquin, parties of the second part, all of Kansas City, Jackson county, Missouri, witnesseth:

"First. The parties of the first part contract and agree to permit the parties of the second part, subject to the conditions hereinafter stated, to purchase from the parties of the first part, and first parties agree to sell to the parties of the second part, or

their assigns, the hereinafter described property, at the price of twenty-seven and one-half dollars per acre, net, to the parties of the first part, said consideration to be paid as hereinafter mentioned.

"Second. The parties of the second part shall have the right and privilege at their own expense to subdivide said tracts of land into ten acre lots, and to stake the same on the ground, and to purchase any or all of said land in such ten acre tracts, subject to the conditions hereinafter mentioned; the consideration to the first parties for this contract being that the parties of the second part agree and obligate themselves at their own expense to have prepared, printed and circulated within six weeks from this date, literature and other circulars properly describing and advertising said property, and to proceed therewith with all reasonable dispatch, but any representations, statements, or contracts made by the parties of the second part with any person or persons shall not be binding in any manner on the parties of the first part. Should the parties of the second part fail or refuse to have prepared, printed, and circulated such circulars and literature within said time, then and in that event this contract, shall at the option of the parties of the first part, immediately terminate and be at an end.

"Third. Should the parties of the second part comply with the provisions of paragraph second above, then it is agreed that the parties of the second part shall have the privilege within four months from this date within which to purchase and make the first payments as hereinafter mentioned for not less than six hundred and forty acres of land out of block one (1) as hereinafter described, but if, within said four months from this date, the parties of the second part shall not purchase and make first payment to the first parties of at least six hundred and forty acres of said land then this contract shall terminate and be at an end at the option of the parties of the first part.

"Fourth. Should the parties of the second part comply with the provisions of paragraph two above, and shall purchase and make first payment for not less than six hundred and forty acres as provided in paragraph third above, then it is agreed that the parties of the second part shall have two additional months within which to have the right and privilege to purchase and make first payments on at least an additional one thousand acres of land, and should the parties of the second part fail or refuse to purchase and make first payment on at least one thousand acres additional within said two months then this contract shall immediately terminate and be at an end, at option of the parties of the first part.

"Fifth. Should the parties of the second part fully comply with the conditions of paragraphs two, three and four above, then it is agreed that the parties of the second part shall have the right and privilege within each additional two months thereafter within which to purchase and make first payment on not less than one thousand acres additional of said tracts of land. It being the intention and purpose of this contract that the parties of the second part shall purchase and make first payment within four months from this date for not less than 640 acres of said land, and then within two months thereafter to purchase and make first payment on not less than 1,000 acres additional, and then to purchase and make first payment within each additional two months of not less than 1,000 acres thereof.

"Sixth. Should the parties of the second part within four months from this date fail to purchase and make first payment as hereinafter provided, for at least 640 acres of said land, or should they thereafter fail or refuse to purchase and make first payment on at least 1,000 acres additional every two months thereafter as above provided, then in either event at the option of the parties of the first part this contract shall become at an end, and all parties released from this contract.

"Seventh. It is agreed between the parties hereto that the consideration for said property shall be twenty-seven and one-half dollars per acre, and the payments thereof to be not less than sixty-seven cents per acre in cash at time of purchase and the balance of the consideration to be paid not less than sixty-seven cents per acre per month thereafter until the full amount of the consideration shall be paid, and all deferred payments shall be due and payable to the parties of the first part, without, interest, on the tenth day of each month at Houston, Texas, free of exchange. But it is agreed that should the parties of the second part permit any two of the deferred monthly payments to become due and payable and remain unpaid at any one time, on any tract or tracts of said land, then at the option of the parties of the first part, said optional purchase shall become forfeited and held for naught and all payments thereon shall be forfeited to the parties of the first part as liquidated damages, it being understood and agreed that all payments on said tract or tracts of land so purchased shall be simply option money until the final payment is made, the money paid by the parties of the second part to the parties of the first part on said tract or tracts of land shall be considered simply as rent or option money and not otherwise.

"Eighth. It is understood that the parties of the second part shall have the right and privilege to purchase said tracts of land, subject to the provisions hereof, in ten acre lot or tract, but not in any fractional part thereof without the consent of the parties of the first part.

"Ninth. Should the parties of the second part, or their assigns, desire to purchase any one or more of said tracts, and de-

sire to pay all cash therefor, then the parties of the first part agree to discount the consideration ten per cent. of the total amount of the consideration for said tract or tracts.

"Tenth. It is further agreed that when the parties of the second part shall have purchased any one or more of said tracts of ten acres as above mentioned, and shall have paid not less than seven dollars per acre cash thereon to the parties of the first part, then the parties of the first agree to give possession to the second parties or their assigns of such tract or tracts upon which such payment of seven dollars per acre shall have been made for the purpose of improvement thereof, except such tract or tracts of land as should be in cultivation, and as to such cultivated tracts possession thereof shall not be given until the crop thereon shall have been harvested and removed therefrom, but such possession so given shall only be as a tenant until the final consideration has been paid and deed executed and delivered. The parties of the first part shall not be required to give or execute, or have executed any deed or deeds to any of said tracts of land until the full consideration for said tract or tracts of land shall have been paid to the parties of the first part, all payments made shall be considered as option money or rent due to the parties of the first part for such tract or tracts of land, and no equity of any form shall be considered between the parties. When the full amount due for said tract or tracts of land shall have been paid to the parties of the first part by the parties of the second part or their assigns, the parties of the first part shall execute or have executed to the parties of the second part or their assigns, general warranty deeds therefor. It being understood that whenever the parties of the second part, or their assigns, desire to purchase in accordance with this contract any part of said land, as above mentioned, and pay the option money therefor, as above provided, that the parties of the first part shall only give receipt for such money paid, showing the amount so paid and what part of said land same is paid on, as such option money.

"Eleventh. It is understood and agreed between the parties hereto that the parties of the second part shall not have the right, without the consent of the parties of the first part to purchase any portion of blocks two, three or four until they shall have purchased and made first payment on at least eighty-five per cent. of the land contained in block 1 herein referred to, nor shall the parties of the second part have the right to purchase any part of block four until they shall have purchased and made first optional payment on at least eighty-five per cent. of all the land contained in blocks one, two and three. The provisions of this paragraph are governed by the provisions in paragraphs two to six inclusive of this contract, and as to block four shall be further governed by the provisions

referred to said block hereafter in this contract.

"Twelfth. The parties of the first part agree to loan to the parties of the second part for inspection, the abstract of title to said property, now in their possession, but said abstract of title shall remain and be the property of the parties of the first part, with the right of inspection at reasonable times by the parties of the second part or their assigns. The parties of the first part agree to pay and keep paid all taxes against said land until deed or deeds of portions thereof shall be executed and delivered to the parties of the second part, or their assigns and thereafter as to such portions of said land to which deed or deeds shall have been executed, the purchaser shall pay the taxes thereafter.

"Thirteenth. The intention of this contract is to give to the parties of the second part an option to purchase tract or tracts of land as above provided, but is not to be compulsory on their part, except as according to the provisions of the amount of land to keep this contract in force. This contract shall be binding on the parties of the first part, their heirs, executors and administrators so long as the parties of the second part shall fully comply with their portion hereof.

"Fourteenth. If, after the parties of the second part shall have purchased and paid option money on any tract or tracts of land hereof, according to the provisions hereof, and this contract shall be terminated, then as to such tract or tracts of land so purchased and upon which option money has been duly paid, and continued to be paid as herein provided, this contract shall remain binding as to such tracts but as to all the other unsold portions hereof this contract shall end.

"Fifteenth. The property referred to above is situated in Bee county, Texas, and is known as the C. W. Hahl & Company subdivision of the R. E. Nutt pasture, according to plat of record in Bee county, Texas. Block one referred to in this contract shall comprise all of section three and the west half of section four, and the northwest quarter of section eight and the north half of section nine. Block two as referred to in this contract shall comprise the east half of section four, and all of section five, and the northeast quarter of section eight, and all of section seven except the southwest quarter, and all of section six and the south half of section eight. Block three as referred to in this contract shall comprise all of sections thirteen and twenty-one and all of section twelve except the northwest quarter and the west half of section twenty and all of section fourteen except the northwest quarter. Block four as referred to in this contract shall comprise all of sections two, ten and eleven except 40 acres in the northeast quarter of section two and six acres in the south half of section ten. It being understood, however, that none of block four above mentioned shall be included in this contract if, within

thirty days from this date the parties of the first part shall have sold or contracted the sale thereof."

After the execution of the contract, McPherson became the owner of the interest of Darrow and Paquin thereunder. At the date of the execution of this contract, Hahl & Co. represented to McPherson that the title to the land described in the contract was good and the land ready for sale and delivery of possession whenever sales could be made, and if it should become necessary to have the title examined they would furnish abstracts of title and an opinion of a reputable attorney showing the title to be good and merchantable; that McPherson was unacquainted with Texas land titles, and believed and relied upon these representations.

McPherson advertised the lands for sale under the aforesaid contract and an extension of same which had been made, and expended about $3,000 in so doing, and had arranged to sell a portion of said lands, believing that the title thereto was good and that when such sale was made the purchasers would be invested with good and merchantable title.

In the meantime, Hahl & Co. had assured McPherson that there were no defects in the title to the property, no litigation involving the same, and an opinion would be furnished showing the title to be good as soon as the abstract of title could be brought down to date. As a matter of fact, however, the vendor's liens above mentioned were outstanding against the premises, and there were various other judgment liens recorded against C. W. Hahl which constituted liens against the land, and on February 1, 1909, a suit was pending in Goliad county for the foreclosure of the vendor's lien to secure the payment of the purchase-money notes given to R. E. Nutt. These facts were ascertained by an attorney employed by McPherson to investigate the title to the premises, and said attorney ascertained that Hahl & Co. did not have title to the lands, and that the title of Candlish, whom Hahl & Co. represented, was incumbered by the vendor's and judgment liens above indicated. Thereupon, on February 23, 1909, the following contract was entered into between the parties therein named, viz.:

"The following memorandum of agreement is this day made between John J. McPherson and the Prudential Land Company on the one part, and C. W. Hahl & Company, a copartnership composed of C. W. Hahl and F. A. Connable, parties of the second part, witnesseth: A certain contract was heretofore made between C. W. Hahl & Company and John J. McPherson and others dated the 10th day of September, 1908, with reference to the sale of certain lands in Bee county, Texas, which contract with its recitals is well known to the parties hereto and is referred to and made a part hereof for description. Said Hahl & Company now here agree with said McPherson and said Prudential Land Company that, within ten days from this date—that is to say, not later than the 5th day of March, 1909—they will procure and deliver to said McPherson and said Prudential Land Company a written extension, in all things fully extending and ratifying the terms of said contract of September 10, 1908, for a period of ninety days from and after March 5, 1909, such extension to be binding upon said Hahl & Company and C. W. Hahl and F. A. Connable and the owners of said land, and to be sufficient to fully extend said contract and protect the said McPherson and the said Prudential Land Company in the full exercise and enjoyment of said contract and its terms. Said Hahl & Company deposit two thousand ($2,000.00) dollars in the Houston National Bank of Houston, Harris county, Texas, together with a copy of this contract stipulating and agreeing that, in the event they should fail to procure, grant and deliver the written extension called for in the foregoing paragraph, that this two thousand ($2,000.00) dollars is to be paid by the bank, without further orders, to Baker, Botts, Parker & Garwood, attorneys for said McPherson and Prudential Land Company. This two thousand ($2,000.00) represents a portion of the expense incurred by the said McPherson and said Prudential Land Company in connection with the aforesaid contract and in the event Hahl & Company fail to do the things stipulated in the first paragraph hereof, it is the understanding of this agreement that they are to repay said two thousand ($2,000.00) dollars expenses and forfeit the same to said McPherson and Prudential Land Company, and they now here acknowledge their obligation to pay this amount under these conditions, and the payments of the $2,000.00 is to, and shall, release all parties hereto and terminate the original contract. John J. McPherson, by Thos. P. Fenlon, Attorney. Prudential Land Co., by Thos. P. Fenlon, Attorney. C. W. Hahl & Co., by C. W. Hahl.

"The land embraced in the contract, as it is hereby extended, is the same land described in the original contract, except the land south of the railroad and west of Medio creek, and including instead of that land just excepted, all of section fourteen (14) except 161 and a fraction acres conveyed to Geisler and others out of the northeast portion. John J. McPherson, by Thos. P. Fenlon, Attorney. Prudential Land Company, by Thos. P. Fenlon, Attorney."

In accordance with the provisions of said contract, C. W. Hahl & Co. deposited $2,000 in the Houston National Bank, to be held and delivered by it in accordance with the terms and provisions of said contract.

That at the time this last-mentioned contract was executed, neither McPherson nor his attorney knew with any definite accuracy the condition of the title to the lands; they

having never seen an abstract of title thereto, and their information in regard thereto being from rumor and statements made by Hahl & Co.

That on March 4, 1909, William J. Candlish, the owner of the land, and C. W. Hahl & Co. executed and delivered unto McPherson their written agreement, reading as follows: "Whereas, on the 10 day of September, 1908, C. W. Hahl & Company (composed of C. W. Hahl and F. A. Connable) executed a certain written contract with J. J. McPherson as trustee for himself and others, regarding the sale by said Hahl & Company to said McPherson, trustee, of certain properties situated and located in Bee and Goliad counties, Texas, and being a part of what was known as the C. W. Hahl & Company subdivision of the R. E. Nutt pasture in said counties, which said land is fully described in said contract and to which contract reference is now made; and whereas, at the time of the entering into of said contract said C. W. Hahl & Company were acting as the agents and representatives and with full authority from Wm. J. Candlish, the owner of said land; and whereas, by the terms of said contract the same had expired, but that the parties to said contract desire an extension of said contract: Now, we, C. W. Hahl & Company and Wm. J. Candlish, owner of said land, do hereby extend the said contract above referred to according to the terms thereof, for a period of ninety (90) days from and after the fifth day of March, 1909; that should the parties of the second part in said contracts above referred to, fail to sell block 1 within said ninety days and pay therefor according to the terms of said contract, above referred to, then this extension, as well as the original contract shall become null and void. This extension is executed by the parties hereto according to the terms of an agreement and in consideration thereof of that certain contract entered into between C. W. Hahl & Company and John J. McPherson, trustee, and the Prudential Land Company dated February 23, 1909."

The contract of March 4, 1909, was executed and delivered by Hahl & Co. and Candlish, and it was by them contended to be in full compliance and performance of the obligations assumed by them in the previous contract entered into on February 23, 1909.

When the contract of March 4, 1909, was delivered, the land was then incumbered with said vendor's and judgment liens for large amounts, and because thereof Candlish, the then owner of the land, did not have good and merchantable title thereto, and it was impossible for McPherson to make sales of the land to his proposed purchasers and deliver them good title thereto.

HARPER, C. J., did not sit as to these additional findings.